IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : CRIMINAL CASE NUMBER: |
| | : 1:15-CR-00272-2-AT-JSA |
| BRANDI JACKSON, | : |
| Defendant. | : |

**FINAL REPORT AND RECOMMENDATION**

On March 22, 2013, a car slammed through an intersection in Atlanta, striking numerous vehicles. Several occupants fled, leaving behind a badly injured shooting victim in the backseat. Ultimately, the police arrested a number of individuals for what turned out to be a drug trafficking and illegal firearms case, including Defendant Jackson. Jackson was not found or observed by law enforcement inside the car, but was arrested nearby on the street by unidentified Atlanta Police Department ("APD") officers who did not testify. Defendant now alleges that her arrest was unlawful as unsupported by probable cause, and she moves to suppress all evidence and statements obtained as a result [37] [38].

The Court agrees with Defendant that the record is lacking with regard to why the arresting officers arrested Defendant and whether they had probable cause

to do so.  Thus, the Court **RECOMMENDS** that Defendant's Motions to Suppress Evidence and Statements both be **GRANTED**.

## I.     FACTUAL BACKGROUND

The following facts are obtained from the testimony presented to the Court on January 12 and 19, 2016 [57][59], the transcripts of which are in the record respectively at [61] ("Tr. I") and [62] ("Tr. 2").

On the afternoon of March 22, 2013, several APD officers were called to investigate a multiple car accident at the intersection of Spring Street and North Avenue in Atlanta.  Tr. I at 9-10.  Specifically, according to a video that was obtained, a red Range Rover plowed through the red light at North Avenue at high speed, hitting several vehicles.  *Id.* at 11, 22; Gov't Ex. 1 (Video (at 40 min)).  The video shows two male passengers leaving and running away from the car.  Tr. I at 12; Gov't Ex. 1 (at 52 min.)).  The police saw inside the Range Rover in plain view two handguns, money, shell casings, shattered glass, blood, and what may have been a woman's purse (although the Detective admitted he really did not know whether it was specifically a woman's purse).  Tr. I at 26-27, 35.

Emergency Medical Services ("EMS") responders immediately arrived, as several individuals at the scene were injured, and a badly injured shooting victim (apparently, Defendant Bellman) was still present in the back of the Range Rover.  Tr. II at 113-117.  An ambulance transported Bellman to the hospital.  *Id.*

Emergency Medical Technician Stephanie Reese testified at the hearing, and explained that she also treated a second shooting victim, whose name was not identified. *Id.* at 117-118. Apparently, this individual was found by police officers walking around near the scene. *Id*. at 117. While Reese was treating the second victim, she overheard what the victim told a police officer about how he was shot. According to Reese's recollection of the victim's story to the officer, the victim met the occupants of the Range Rover to buy drugs, but once he entered the car, a female pointed a gun to him and said "give me your money." Tr. II at 119. He attempted to push the gun out of his face, but the gun accidently discharged, wounding him. *Id.*[1] According to Reese, after the victim recounted this story, he then leaned out of the ambulance, pointed and said "that's the female." *Id.* at 119, 130, 138. Reese looked to where the victim pointed and saw a women speaking with police officers. *Id.* at 120, 129.

The Government points to no testimony specifically identifying the Defendant as the woman who Reese saw the victim point to. According to the case agent's review of the reports and interviews with at least some of the officers and detectives on the scene, however, no other female was arrested as part of this case. Tr. II at 137-138.

The Government introduced no testimony from any officer who arrested

---

[1] It is not clear whether this is was the same shot that wounded Bellman.

Defendant Jackson or anyone else that had any interaction with her before she was brought into the police station.  According to Detective Velasquez, who met and interrogated her at police headquarters, "[a]s far as I understand, she was arrested on the scene."  Tr. I at 42.  But Velasquez did not explain his basis for that "understand[ing]," or provide any other details about the arrest.  When asked "Do you know what facts were known about Brandi Jackson at that time [i.e., the time of her arrest]," the Detective responded "At that time she was involved in the incident, her and [Co-Defendant] Laquan [Johnson]."  Tr. I at 44.  Because it was obviously nonresponsive to simply say "she was involved in the incident," defense counsel followed up by asking "I'm ask– do you understand my question?"  *Id.*  The Detective responded, "I understand but I don't – I can't get any more specific than that."  *Id.*  When asked who arrested Defendant, the Detective stated "the responding officers."  *Id.* at 44-45.  When asked "who was that? Do you know specifically," the response was "not off hand."  *Id.*

The Government also elicited testimony from APD Detective Leonpacher, who spoke with Defendant after Detective Velasquez did, also at police headquarters.  When asked what facts he was aware of relating to Defendant at the point he began his interrogation, Detective Leonpacher stated that he heard "she may have been implicated in participating in or may be culpable for the robbery that occurred or the attempted robbery that may have occurred inside of the

vehicle." Tr. I at 96-97. Detective Leonpacher could recall no specific facts that he had been told to support these suspicions, and his contemporaneous notes simply stated that he was advised that Defendant was "potentially a suspect." Tr. I at 98. Detective Leonpacher's source of information about Defendant's involvement was Detective Velasquez who, as noted above, also could supply no facts relating to why Defendant was arrested other than the conclusion that "she was involved in the incident."

After being brought to police headquarters, Defendant was read her *Miranda* rights, which she agreed to waive. Defendant proceeded to make a statement, in which she admitted that she was in the Range Rover but denied having a gun. Tr. I at 70-71. After the interview, Defendant also consented to the officers swabbing her hands for purposes of a gunshot residue test. Tr. I at 74-75.

## II.   DISCUSSION

### A.   *Probable Cause To Support The Arrest*

When the constitutional validity of an arrest is challenged, the Government must show that the facts available to the arresting officers at the moment of the arrest support a finding of probable cause. *Beck v. Ohio*, 379 U.S. 89 (1964). Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is

being committed by the person to be arrested. *United States v. Waksal*, 709 F.2d 653, 658, n. 8 (11th Cir. 1983). Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause. *United States v. Astling*, 733 F.2d 1446, 1460 (11th Cir.1984). While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough. *United States v. Ingrao*, 897 F.2d 860, 862 (7th Cir.1990).

Here, the Government has adduced no testimony or other evidence explaining the basis of Defendant's arrest or even identifying the officers who arrested her.  The Government has also not introduced any evidence of the circumstances of Defendant's arrest, including when and where she was arrested. The closest thing that the Government points to is a statement from a Detective that encountered Defendant at the station, that "[a]s far as I understand, she was arrested on the scene."  Tr. I at 42.  This Detective had no personal knowledge of the arrest, however, and provided no facts to show a reliable foundation to support his unexplained "understand[ing]."  As to the factual basis for her arrest, neither Detective Velasquez nor Detective Leonpacher–nor any other witness called by the Government–could explain anything.  Detective Velasquez simply recalled the conclusion that "she was involved in the incident," which was as specific as he could get.  Detective Leonpacher–whose source of information was Detective

Velasquez–simply remembered being told that Defendant was "potentially a suspect."

Obviously, unexplained suspicions or conclusions do not amount to probable cause.  Thus, the Government appears to mainly focus on the conversation overheard by EMT Reese.  Oddly, instead of calling the officers who actually investigated and arrested Defendant, or the officer who actually interviewed the shooting victim, the Government only called an EMT who overheard that interview.  According to Reese, she recalled the victim mentioning that a female shot him.  Reese then saw the victim point to and identify some female nearby on the street.  Because Defendant Jackson was the only woman ultimately arrested in this investigation, the Government apparently wishes the Court to infer that Jackson was the woman that Reese saw the victim identify.  But the Government elicited no testimony–from Reese or otherwise–identifying Defendant as the mysterious woman on the street, stating that this tip from the victim was the reason for the Defendant's arrest, showing that the information was relayed by the interviewing officer to anyone else, describing the circumstances of any arrest or even stating that the woman identified by the victim was arrested.

The Government's burden to prove probable cause is not a high one.  And, while unusual, the Court is aware of no legal barrier preventing the Government from relying on indirect, circumstantial evidence of the facts surrounding an arrest

and reasons for it.  But there are simply too many holes in the evidence presented here for the Court to find that the arresting officers had probable cause to arrest Defendant.

Even taking Reese's evidence as reliable, her testimony falls well short.[2]  At most, the record shows that a witness pointed to some unidentified woman on the street as a shooter, and that Defendant was ultimately the only woman arrested.  To assume that Defendant was the same person identified by the victim, and that this information was the basis for arrest, is too much of an inferential leap for the Court

---

[2] The defense raises serious questions about the reliability of Reese's testimony.  Reese testified about an event that occurred approximately three years earlier, without taking any notes or other contemporaneously-recorded material relating to the shooting victim's identification of the shooter.  Tr. II (noting that her notes, as an EMT, would "just document injuries versus what a police report would reflect.")  Reese also told the case agent several days before the hearing that "it was a long time ago, I would have to think about it, try and maybe pull my trip sheet and see if I can read that and refresh my memory, and I spent several days thinking about it and going over it."  Tr. II at 127.  Reese then refreshed her memory in part by talking with another EMT, named "Kyle," who did not testify, and who was not present during the event to hear the identification by the shooting victim.  Tr. II at 123-125.  At one point in the hearing, Ms. Reese stated that she had also refreshed her recollection by looking at "aerial shot[s]" of the event, which Kyle was able to pull up on his phone.  *Id.* at 128.  But then Reese stated that "you cannot see people.  Its very distorted.  It's a very far out picture."  Tr. II at 130.  In a very odd exchange, Reese stated "I never stated that I saw a female in a photo," *Id.*, even though just two pages earlier in the transcript she stated "There's one aerial shot where our ambulance is sitting right there, and our back doors are open, and there's a police car sitting here, and a female was with the two police officers."  *Id.* at 128.  These are puzzling facts with regard to the reliability of this witness.  In the end, however, the Court need not make any particular findings relating to Reese's credibility or reliability, because even crediting her testimony, it is insufficient to establish probable cause to arrest Defendant.

to make. Perhaps the woman on the street ran away after being identified. Perhaps Defendant was ultimately arrested based on the belief that she was the same woman, or for some other reason altogether. Perhaps the officers chose not to arrest the woman on the street, because they learned other information inconsistent with the victim identification of her. Perhaps, for whatever other reason, the police ultimately arrested a different person than the one identified by the witness. There are just too many other plausible scenarios competing with the one that the Court wishes the Court to adopt.

It remains the Government's burden to prove what facts were known to the arresting officers and why they arrested Defendant. This record is absolutely insufficient to meet that burden and the Court must conclude for purposes of this criminal prosecution that Defendant's arrest and detention was unlawful.

### B.   *The Suppression of The Gun Power Residue Test*

Evidence obtained during and as a result of an illegal detention must generally be suppressed. *See United States v. Epps*, 613 F.3d 1093, 1099 (11th Cir. 2010). Defendant thus argues that all evidence obtained during her detention must be suppressed, including her confession and the results of the gun powder residue swab of her hands.

The Government concedes that, should the Court find the arrest unlawful, Defendant's confession must be suppressed as a fruit of that poisonous tree. *See*

Gov't Br. [78] at 12.  Therefore, as the undersigned finds the arrest and detention to be unlawful, it follows that the confession must be suppressed.[3]

The only evidence that the Government argues should be admissible notwithstanding an illegal search would be the results of the gun powder residue test.  The Government cites several cases for the proposition that a gun powder residue test does not in itself implicate Fourth Amendment privacy concerns, because of the minimal intrusion on suspect's body (here, the test involved a swab of Defendant's hands), and the inherent exigency given that such residue can be washed off or dissipate.  *See*, *e.g., United States v. Bridges*, 499 F.2d 179, 184 (7th Cir. 1974).  The Government also points out that a gun residue swab implicates no Fifth or Sixth Amendment concerns.  Gov't Br. [78] at 12-13.

Mere extractions of physical evidence through minimally-invasive swabs or prints have long been treated to lesser Fourth Amendment scrutiny.  But that is beside the point, because "[t]he obtaining of physical evidence from a person involved a potential Fourth Amendment violation at two different levels-the 'seizure' of the 'person' necessary to bring him into contact with government agents and the subsequent search for and seizure of the evidence." *United States v.*

---

[3] Defendant does not separately argue in his post-hearing brief that the confession was involuntary or was taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Therefore, the sole basis of the Court's recommendation to suppress the confession was that it was a fruit of the Fourth Amendment violation.

*Love*, 482 F.2d 213, 216 (5th Cir. 1973).  Here, the issue raised by Defendant is not the propriety of the warrantless swab itself, but rather that it occurred during and as a result of an illegal seizure. In other words, the point is not whether the Fourth, Fifth or Sixth Amendment required a warrant to swab the Defendant's hands.  The point, rather, is whether the police even had the minimum justification to temporarily seize Defendant in the first place to undertake a swab.

Apparently to address this point, the Government argues that even if the initial arrest of Defendant were unlawful, the officers had sufficient facts to justify at least a minimal investigative seizure as of the time of the residue swab. Specifically, the Government argues that "by the time officers took the gunshot residue swab they knew that 'there had been a shooting inside a vehicle' and Jackson admitted her presence in the vehicle."  Gov't Br. [78] at 14-15.  While the Government cites no particular authority or legal principles in support of this argument, presumably the Government is invoking a variety of the "independent source" doctrine.  Pursuant to this doctrine, evidence obtained during an illegal search or seizure may be saved from exclusion if the Government "purge[d] the taint" by showing that the challenged evidence was independently obtainable by lawful means.  *See, e.g., United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007).  The Government, apparently, takes the position that the gun power residue test was no longer tainted by the original unlawful arrest, because the officers

independently had grounds to detain Defendant by the time of the test.

The Government's position is meritless. Clearly the Court cannot consider Plaintiff's admission that she was present in the vehicle as contributing to an "independent" basis for detention. As the Government itself concedes, "if the Court were to find that Jackson was unlawfully arrested, her statement is suppressible under the fruit of the poisonous tree doctrine." Gov't Br. [78] at 12. By definition, therefore, Defendant's statements are *not* independent of the original illegality, cannot purge any taint, and cannot justify the detention or any other investigative action.[4]

---

[4] The officers stated that Defendant Jackson consented to the swabbing. Tr. I at 74-75. But the Government does not argue that this alleged "consent" satisfies its burden to show an "intervening independent act of free will" sufficient to overcome the primary taint of the unlawful detention. *See Wong Sun v. United States*, 371 U.S. 471, 486 (1986); *United States v. Chavez-Villarreal*, 3 F.3d 124, 127-128 (5th Cir. 1993) ("Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will. To determine whether the causal chain was broken, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. The burden of showing admissibility rests on the government.")

The Government also does not invoke the line of Eleventh Circuit authority declining to suppress identity-related evidence (including fingerprints). *See, e.g., United States v. Farias-Gonzalez*, 556 F.3d 1181 (11th Cir. 2009); *United States v. Aguila-Perez*, 344 Fed. Appx. 521 (11th Cir. 2009). Among other considerations, allowing suppression of identity-related information would effectively allow a suspect to "suppress the court's jurisdiction over him," which would be an unwarranted application of the exclusionary rule. *Farias-Gonzalez*, 556 F.3d at 1188. In this case, the police had plainly already identified Jackson by the time they conducted the gunpowder residue test, and nothing about that test was

Otherwise, the Government continues to elicit absolutely no *facts* to explain Defendant's arrest or detention.  All the Government argues is that the officers knew "a shooting had occurred within the vehicle and that Jackson was implicated in the shooting . . . ."  Gov't Br. [78] at 14.  But, again, the full testimony of the Detective in this regard was simply that he was told by another officer that Plaintiff "*may* have been implicated in participating in or *may* be culpable for the robbery that occurred or the attempted robbery that *may* have occurred inside of the vehicle."  Tr. I at 96-97 (emphasis added).  When asked to describe the facts that supported these bare, equivocal conclusions and "possible" suspicions, Detective Leonpacher had nothing to say.  Tr. I at 96-98.  Nor could his source of information–Detective Velasquez–offer anything more specific than that he also suspected that Plaintiff "was involved in the incident."  Tr. I at 44.  Even brief detentions must at a minimum be justified by *specific articulable* facts sufficient to give rise to a *reasonable* suspicion of criminal conduct.  *See United States v. Harris*, 928 F.2d 1113, 1116 (11th Cir. 1991).  The Government, here, however offers nothing to meet even that low and flexible standard.[5]  Thus, there is no basis

---

necessary to solidify the officers' investigation of Jackson's identity.  The concerns of *Farias-Gonzalez* do not apply.

[5] Neither Detective mentioned anything about being aware that a victim had identified Defendant or any other female shooter on the street.  But, even if so, as explained above, that a victim mentioned some female shot him, and then identified some female on the street, does not, without more, allow any reasonable

to save the gun powder test from suppression. Defendant's motion should be granted.

This case is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** This 16th day of June, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

suspicion or conclusion that the *Defendant* specifically was the shooter.